Dr. Inga KARETNIKOVA, Plaintiff,

v.

The TRUSTEES OF EMERSON COLLEGE and Dr. Allen E. Koenig, individually and in his capacity as President of Emerson College, Defendants.

Civ. A. No. 88–549–K.

United States District Court,
D. Massachusetts.

June 27, 1989.

Motion for Reconsideration Denied
Nov. 16, 1989.

---

Brian G. Burns, Boston, Mass., for plaintiff.

Richard D. Wayne, Hinckley, Allen, Snyder & Comen, Boston, Mass., for defendants.

MEMORANDUM AND ORDER

KEETON, District Judge.

Dr. Inga Karetnikova filed this action in Massachusetts Superior Court alleging that

the President and Trustees of Emerson College denied her promotion and tenure on the basis of her expression of her political beliefs. Plaintiff alleges that the defendants acted in violation of her rights under the law of contracts, and in violation of other state law rights. Defendants removed this action to federal court and now move to dismiss.

Defendants also move to strike plaintiff's memorandum in opposition to their motion to dismiss on the ground that it was not timely filed. Defendants, however, have not made any showing that they have been prejudiced by the late filing. Plaintiff's motion to file the memorandum late is allowed.

Defendants have moved to dismiss on the following grounds. First, defendants argue that plaintiff's contract claims are barred because the plaintiff did not comply with the grievance and arbitration procedure provided in the Collective Bargaining Agreement ("CBA"). Second, defendants argue that plaintiff's claim in Count III for breach of a covenant of good faith is preempted by the CBA. Finally, defendants argue both that Count IV fails to state a claim under the Massachusetts Civil Rights Act ("MCRA"), and that such a claim, if alleged, would be preempted by the CBA. As to Count III, the motion to dismiss is allowed in part. In all other respects the motion to dismiss is denied.

## I. Facts Alleged in the Complaint and Appended Exhibits

Plaintiff alleges the following facts:

Dr. Karetnikova is an art scholar and film critic. In 1981, she accepted a tenure-track faculty position at Emerson College. In each of the following years, up to and including the academic year 1986–87, she entered into a one-year contract with Emerson College that incorporated the CBA between Emerson and the Emerson College Chapter of the American Association of University Professors, the certified bargaining representative for the College's regular full-time faculty.

The CBA sets forth in detail the procedures to be followed and the standards and criteria for the award of promotion and tenure. In accordance with the procedures set forth in the CBA, Karetnikova submitted her application for promotion and tenure in September 1986. The Divisional Promotion and Tenure Committee, as provided by the CBA, then reviewed her application. The Committee expressed its strong support for her tenure application and voted unanimously to approve the granting of promotion and tenure to Karetnikova. The Committee noted in particular her "outstanding research, publication and creative accomplishment, and her continuing recognition nationally and internationally in the fields of film and art."

Next, also in accordance with the CBA, Karetnikova's application was forwarded to the All College Faculty Status Committee, which also voted "unanimously and enthusiastically" to support the granting of tenure to Karetnikova and noted "Karetnikova's credentials as a published scholar and creative professional." The application was then forwarded, as provided by the CBA, to the Chief Academic Officer of Emerson, the Provost, Dr. Michael Kittros, who also strongly recommended that Karetnikova be granted promotion and tenure. The application then went, in accordance with the CBA, to the President of Emerson, Dr. Allen E. Koenig, who recommended against promotion and tenure. The Trustees voted to deny Karetnikova promotion and tenure. The letter from the Vice President and Academic Dean, Jacqueline Liebergott, which informed Karetnikova of the denial, stated that her denial was "related primarily to insufficient evidence of scholarship, research, and creative accomplishments during the period of time [she] was a member of the Emerson faculty."

Karetnikova alleges that she was denied tenure, not because of a lack of evidence of scholarship and research, but because Allen Koenig, the President of Emerson College, disagreed with her conservative political views and her views about a proposed student exchange program with the Soviet Union. Karetnikova alleges that after publication of her opinions, she encountered "a negative change in the President's attitude towards her" and that Koenig "no longer

spoke to her or acknowledged her presence when meeting in public, nor did he award her bonuses for teaching, as he did to others, despite her superior evaluations."

## II.   Failure to Use Grievance Procedure

■ Defendants argue that plaintiff's claims under the CBA are barred because the CBA provides a grievance and arbitration procedure, which they allege is the exclusive remedy for claims arising under the CBA.   Under federal labor law, where a collective bargaining agreement provides a grievance procedure as the exclusive remedy for the claim, an employee must at least attempt to exhaust all of the contractual provisions for resolving a grievance before resorting to the courts.  *See United Paperworkers International Union v. Misco*, 484 U.S. 29, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987).   It is undisputed that Karetnikova has not pursued the grievance and arbitration procedures provided by the contract and is now timebarred from doing so.

■ Plaintiff argues that she is not required to exhaust the grievance and arbitration procedures provided by the CBA because the CBA affirmatively excepts claims of a substantive nature concerning promotion and tenure from the grievance and arbitration procedure.   The CBA provides that all grievances are arbitrable except as otherwise stated in the CBA.   The CBA, Section 11.2, also provides, however:

> It is understood that as regards promotion, appointment, reappointment, and tenure, the issues to be grieved are procedural and not substantive in nature.

Plaintiff's claims that she was improperly denied tenure and promotion are substantive in nature.   Plaintiff has not alleged any procedural irregularity in the processing of her application.   In fact, she has explicitly alleged that each procedural step taken was in accordance with and provided for by the CBA.   Her claims concern alleged departures from permissible substantive criteria for tenure and promotion decisions.   Claims of failure to consider proper criteria and claims of consideration of improper criteria are substantive, not procedural, in the sense that is relevant here.   Nor has any party provided any evidence for a different interpretation of the terms substantive and procedural.   Thus, because her disputed claims are substantive rather than procedural, the CBA explicitly exempts them from the grievance procedure under the CBA.

■ Defendants do not dispute that this provision of the CBA precludes plaintiff from obtaining review, through the grievance and arbitration procedures, of disputes over substantive issues regarding promotion and tenure.   Defendants argue, however, that this clause of the CBA extinguishes any substantive claim for tenure or promotion.   This is a contention that the exemption clause of the CBA operates to preclude all substantive rights under the contract with respect to promotion, appointment, reappointment and tenure, including the contract right to be free from discrimination.   The fact that the contract does not provide for arbitration of a dispute over substantive rights, however, does not extinguish those provisions of the contract declaring the existence of substantive standards.   A contract is presumptively enforceable in the courts absent an explicit agreement to resolve disputes in some other manner.   Plaintiff in this case, therefore, was not required to grieve her claims of substantive impropriety in the tenure and promotion decision process and may pursue these claims in this court.

## III.   Preemption of Count III

■ Defendant also argues that Count III is preempted by the CBA pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185.   Section 301 provides jurisdiction in federal district courts for suits "for violation of contracts between an employer and a labor organization representing employees...."   The Supreme Court has construed § 301 to authorize federal courts to create a uniform body of federal law for the enforcement of collective bargaining agreements.   *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957).   As part of this uniform body of federal labor law, the Court has held that inconsist-

ent local rules and causes of action, including causes of action other than breach of contract actions, are preempted by the federal common law. *See Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 209–10, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206 (1985); *Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 103–4, 82 S.Ct. 571, 576–7, 7 L.Ed.2d 593 (1962).

Plaintiff's claim in Count III is a claim for breach of an implied covenant of good faith and fair dealing. Plaintiff does not state whether she means to allege a claim pursuant to the CBA, or whether her claim is one under federal or instead under state law, or under both. To the extent, if any, that plaintiff seeks to state a claim under state law in Count III, independent of the CBA, it is preempted by the CBA because the claim is premised on interpreting the terms of the contract and is thus dependent upon the terms of the contract. *See Bertrand v. Quincy Market Cold Storage and Warehouse Co.,* 728 F.2d 568 (1st Cir.1984). To the extent that plaintiff in this Count seeks to enforce a covenant implied in the CBA under federal law, however, it is not preempted. Count III is preempted, therefore, only to the extent, if any, it seeks to raise an independent state law claim.

### IV. Count Four: Failure to State a Claim under the Massachusetts Civil Rights Act

In Count IV, plaintiff alleges that the defendants violated her rights under the Massachusetts Civil Rights Act by denying her tenure on the basis of her political expression and thereby attempting by "threats, intimidation or coercion" to interfere with her constitutional right to free speech.

Defendants argue, on three grounds, that these allegations fail to state a claim under the MCRA, Mass.Gen.Laws ch. 12, §§ 11H—I (1986). First, they argue that plaintiff has not alleged sufficient facts to support her claim that her speech was protected. Second, defendants argue that plaintiff has failed to plead facts which allege interference with her rights "by threats, intimidation, or coercion" within the meaning of MCRA. Third, defendants

argue that litigating a claim such as this one would have a chilling effect upon free speech and therefore is barred by the First Amendment.

> It is a violation of the MCRA to interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth.

Mass.Gen.Laws. ch. 12, §§ 11H—I (1986).

■ Defendants' first argument, that plaintiff has not sufficiently identified her political views in order to show that they are protected, is without merit. Although plaintiff has the burden of establishing that the speech in question was protected speech, *see Mt. Healthy City School Board v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), plaintiff has met the pleadings aspect of that burden here. She has alleged that she was denied tenure because of her conservative speech and publication on political issues. She has referred to two journals where her views are published. She has also alleged that she spoke out about a proposed Soviet student exchange and expressed views in opposition to those held by Dr. Koenig. These allegations are sufficient to show that protected speech of public concern is at issue. Plaintiff has therefore satisfied her burden on this issue under Fed.R.Civ.P. 8.

■ The issue raised by defendants' second theory for why Karetnikova has failed to state a claim under MCRA, *i.e.* that she has not sufficiently alleged "threats, intimidation or coercion," was recently addressed by the Supreme Judicial Court in *Bally v. Northeastern University,* 403 Mass. 713, 532 N.E.2d 49 (1989). In that case, the Supreme Judicial Court stated that the cancellation of a contract, if it has the "effect, intended or otherwise, desired or not, of coercing [the plaintiff] not to exercise her First Amendment rights," violates the MCRA. *Id.* Thus, the SJC seems to indicate that coercion under MCRA is not a

state-of-mind standard and that cancellation of a future economic relationship such as is at issue in this case is sufficient to constitute coercion. Furthermore, the Court in *Bally* cites *Redgrave v. Boston Symphony Orchestra*, 399 Mass. 93, 95, 502 N.E.2d 1375 (certified questions ans.), as support for this proposition. In that case, like this one, the "coercive act" of the defendants consisted only in cancelling a contract. Indeed, the facts in that case were even less compelling as proof of coercion of speech than the facts alleged in this case because the contractual opportunity cancelled in that case—narration of Boston Symphony Orchestra performances—was not an opportunity for further political speech, whereas Karetnikova's position at Emerson College was and is. *Cf. Redgrave*, 399 Mass. 93, 502 N.E.2d 1375 (1988). Because this court is interpreting Massachusetts law in ruling on this claim, it is necessary for the court to pay careful attention to intimations as well as explicit holdings in Massachusetts court opinions. The statements about the meaning of "coercion" made by the Supreme Judicial Court in *Bally* strongly suggest that plaintiff's allegation that Emerson and Koenig acted to deny Karetnikova tenure and promotion on the basis of her political belief and speech sufficiently alleges coercion under MCRA. Dismissal on this basis is therefore not appropriate.

■ Defendants' third theory for why Karetnikova has not stated a claim under MCRA is that her claim is barred by the First Amendment. Defendants argue that her allegations have had a chilling effect on the free speech rights of the defendants and create an "unwarranted burden upon their right to administer and govern the private college." The First Amendment, however, unlike the MCRA, provides protection only against government interference with free speech. Thus, the First Amendment does not protect the defendant from the allegations of private parties, such as Karetnikova.

The First Amendment may, of course, protect the defendants from state action in the form of relief ordered by a court which would interfere with their exercise of free speech rights. Defendants, however, have offered no evidence or precedent to support their argument that this court, merely by allowing this case to go forward, is placing an undue burden on their First Amendment rights. In addition, the Supreme Judicial Court in *Bally*, again referring to the *Redgrave* case, stated that the actions of the Boston Symphony Orchestra in terminating its contract with Redgrave violated the MCRA, despite similar concerns about the First Amendment rights of the Boston Symphony. *See Bally*, 403 Mass. 713, 532 N.E.2d 49 (1989). Even if taken as referring only to a plaintiff's prima facie case, the court's comments in *Bally* indicate that under the Massachusetts Court's interpretation, Karetnikova has stated a claim for a violation of the MCRA. Defendants may later be able to advance constitutional defenses to her claim on the ground that any relief would punish them for their constitutionally protected expression. *See Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888, 906 & n. 21, *cert. denied*, — U.S. —, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989) (expressing concern that if the MCRA means that "a private university would be liable for denying tenure to a professor whose views it found politically reprehensible," it would implicate "a very complex clash of rights" regarding "expression-related interests"). Those defenses, however, do not entitle them to dismissal of the MCRA claim for failure to state a claim. The court cannot determine, simply on the basis of plaintiff's complaint, that she will not be able to overcome any such affirmative defense that is or may be asserted in this case. In these circumstances, defendants' motion to dismiss for failure to state a claim under the MCRA must be denied.

### V. Preemption of Count Four

■ Defendants also argue that even if the plaintiff has stated a claim in Count IV under MCRA, it is preempted by § 301 of the Labor Management Relations Act because plaintiff is claiming that she was denied promotion and tenure in violation of MCRA and, defendants allege, "[p]laintiff's right to employment at Emerson, pro-

motion and/or tenure is dependent upon the provisions of the Collective Bargaining Agreement between Emerson and the AAUP, not state or federal law."

Defendants are correct in noting that if this claim is substantially dependent upon interpretation of the CBA, it cannot stand as an independent state-law claim. The Supreme Court has noted:

> [W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, [citation omitted] or dismissed as pre-empted by federal labor-contract law.

*Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 220, 105 S.Ct. 1904, 1915, 85 L.Ed.2d 206 (1985).

In this case, however, even if the court finally determines that the MCRA claim depends upon interpretation of the CBA, the claim may not be preempted. It may be treated as a § 301 claim pursuant to the CBA, which can go forward in this court. This conclusion is supported by the fact that one major concern in preemption analysis—preserving the grievance and arbitration process—is not at issue here, because a provision of the CBA exempts this type of dispute from the grievance and arbitration procedure. *Cf. Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 219, 105 S.Ct. 1904, 1915, 85 L.Ed.2d 206 (1985), ("noting that a finding of preemption "preserves the central role of arbitration in our 'system of industrial self-government'" [citation omitted]).

A second and more important reason the claim is not preempted is that although plaintiff's MCRA claim may refer to the CBA in some respects, it does not substantially depend upon interpretation of the CBA. Not every state-law claim "that relates in some way to a provision in a collective-bargaining agreement" is preempted. *Allis–Chalmers,* 471 U.S. at 220, 105 S.Ct. at 1915. *See also, Lingle v. Norge Division of Magic Chef,* 486 U.S. 399, 108 S.Ct. 1877, 1885 n. 12, 100 L.Ed.2d 410 (1988). For example, the fact that a collective-bar-

gaining agreement may be relevant to "determining the damages to which a worker prevailing in a state law suit is entitled" does not mean that the state law action is preempted. *Id.* "[D]etermining the extent of damages is not the sort of "substantial dependence" on the labor agreement that mandates section 301 preemption." *Id.* Thus, the fact that the relief plaintiff seeks, promotion and tenure or damages, may be defined by contract does not require preemption in this case.

Similarly, the fact that plaintiff's claim to continuing employment or promotion is created by contract does not require the conclusion that a cause of action for improper deprivation of that right depends upon interpretation of the contract. A similar situation was addressed by the Supreme Court in the recent case of *Lingle v. Magic Chef,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). The plaintiff in *Lingle* alleged retaliatory discharge for her exercise of her rights under workers' compensation. Despite the fact that the contract right to employment was at issue, the Court held the claim not preempted because the claim did not substantially depend on interpretation of the CBA. The court noted that in order to prove a claim of retaliatory discharge, the plaintiff must show:

> (1) [s]he was discharged or threatened with discharge and (2) the employer's motive in discharging or threatening to discharge [her] was to deter [her] from exercising [her] rights under the Act or to interfere with [her] exercise of those rights."

*Id.* 108 S.Ct. at 1882. The court also noted that to defend against a retaliatory discharge claim, an employer must show that it had a non-retaliatory reason for the discharge. The court then stated that "[e]ach of these purely factual questions pertains to the conduct of the employee and the conduct and motivation of the employer." Thus, although the employer, in offering a defense, might argue that some clause of the contract provides a basis for discharge, the court need only determine whether the proffered noninvidious reason was in fact

the basis for the discharge, not whether the proffered reason for the discharge was a reason declared by some provision of the contract to be a basis for discharge under the CBA. *See Baldracchi v. Pratt & Whitney Aircraft Div.*, 814 F.2d 102, 105 (2d Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 2819, 100 L.Ed.2d 920 (1988). *See also Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 51–52, 94 S.Ct. 1011, 1021, 39 L.Ed.2d 147 (1974) (holding that antidiscrimination rights under Title VII cannot be waived by a collective bargaining agreement). Therefore, in deciding Karetnikova's MCRA claim, this court need not determine whether any proffered reason for denial of Karetnikova's application for promotion and tenure discharge is, if not pretextual, a sufficient reason under the contract; the court need only decide whether the reason advanced is pretextual and, if so, the extent to which the true explanation included a forbidden motive to retaliate against her because of her protected speech. Therefore, although Karetnikova seeks reinstatement or damages for the denial of a contract right, her MCRA claim does not turn on the meaning of a contract term defining substantive standards and is not preempted.

Defendants respond with the argument that the recent First Circuit opinion in *Jackson v. Liquid Carbonic Corp.*, 863 F.2d 111 (1st Cir.1988), supports their position that plaintiff's MCRA claim is preempted. In *Jackson*, the First Circuit held that an MCRA claim for interference with privacy rights by employer drug testing is preempted by § 301. The court, after noting that the question was close, concluded that the state-law claim was preempted because the right of privacy depends upon the expectations and agreed-upon arrangements between the employer and the employee and therefore requires contract interpretation. *Id.*

The First Circuit's reasoning in *Jackson*, however, does not support a similar conclusion in the circumstances of this case. Unlike the asserted right to be free from employer drug testing, the right to freedom from interference with speech does not necessarily depend upon the expecta-

tions and agreed-upon arrangements between the employer and employee. A review of the reasoning of the First Circuit in *Jackson* helps to explain this conclusion.

The *Jackson* court first noted that both the federal and state rights of privacy are guarantees only against "unreasonable" searches or invasions of privacy and that neither federal nor state law creates a barrier to a person's free and voluntary agreement to be drug-tested. The court also determined that "an employee's drug use, at least insofar as it may have an impact on an employee's work" may be a legitimate concern of the employer. *Id.* at 116. The court therefore concluded that determination of an employer's right to do drug testing requires a weighing of the interests of the employer against the privacy interest of the employee. Finally, the court noted that "privacy rights in the Massachusetts workplace are affected by a firm's own regulations. *Bratt v. International Business Machines Corp.*, 785 F.2d 352, 360–61 (1st Cir.1986)." *Id.* at 117. The First Circuit then held that in determining what is an unreasonable invasion of privacy in this context, the Massachusetts courts will look to the collective bargaining process "as an appropriate datum in constructing the needed balance between the worker's privacy rights and the legitimate concerns of management" and that the MCRA claim was therefore preempted because it would depend upon interpretation of the collective bargaining agreement. *Id.*

Upon review of the claims and allegations before the court at this time, this court cannot conclude that Karetnikova's MCRA claim for interference with her free speech rights likewise necessarily depends upon the terms of the CBA. Defendants argue that the logic of *Jackson* applies in this case because they argue that in analyzing this claim, the court should look to the analogous situation of state regulation of the speech of public employees, a context where a weighing of employer's interest against employees' interests is also used. In that context, a state may not discharge an employee or deny renewal of a contract or tenure on a basis that infringes that

employee's constitutionally protected interest in freedom of speech, *see Perry v. Sinderman*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), but state employers may, consistent with the federal constitution, properly discharge a public employee for engaging in speech in certain instances. *See Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987). The Supreme Court recently reiterated that, determining when these instances exist, requires

> a balance between the interest of the [employee], as a citizen, in commenting upon matter of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Id.* (quoting *Pickering v. Board of Education* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). The defendants argue that the court should apply this analysis to Karetnikova's claims and that this balancing will necessarily require reference to the CBA and therefore requires preemption.

The Massachusetts Civil Rights Act does have the effect of making applicable to private employers a prohibition against discharge or failure to renew a contract on a basis that infringes an employee's protected interest in freedom of speech. Even assuming, as argued by defendants, that the balancing approach adopted by the Supreme Court for the situation of public employers is adopted by the Massachusetts court in analyzing an employee's right to be free from private employers' interference with protected speech, however, one need not necessarily conclude that this weighing will require reference to the CBA.

Unlike the case with drug testing, a blanket waiver of free speech rights in an employment contract may be impermissible as contrary to declared public policy, and a claim for this interference may therefore be independent of the CBA. Free speech is not simply a personal right which protects the individual who exercises it, such as an asserted right to privacy and freedom from

drug testing may be. *See Utility Workers of America v. Southern Cal. Edison*, 852 F.2d 1083 (9th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1530, 103 L.Ed.2d 835 (1989) ("Drug testing does not implicate the sort of 'nonnegotiable state-law rights' that preclude preemption under section 301."); *Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 1001–02 (9th Cir.1987). Free speech serves a significant public interest transcending the employment relationship. Free speech rights protect not only the speaker, but also the public to whose broad marketplace of ideas the speaker contributes. The interest in the exchange of differing ideas on matters of public concern such as are at issue here is particularly relevant in the university setting. In *Keyishian v. Board of Regents*, 385 U.S. 589, 602, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967), the Supreme Court noted,

> Our Nation is deeply committed to safeguarding academic freedom, which is of *transcendent value to all of us and not merely to the teachers concerned.* That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. [Emphasis added.]

View-point discrimination, based not on what is said in the classroom, but on what is expressed in outside writings and public statements, such as is alleged here, is especially inimical to these concerns.

The right to be free from interference with protected speech is, therefore, at least in part, a right that the faculty may not waive in exchange for other contract concessions because it is a right of transcendent value to the society as a whole, not just to the individual teacher negotiating the contract. Similarly, the conditions or restrictions which may be placed on such speech as conditions of employment are also of concern to society as a whole, and may properly be determined, unlike the case with drug testing, not by reference to the agreement of the parties, but in light of the values of safeguarding robust speech in the marketplace generally, and in the academic setting in particular. Preemption, therefore is not required in all cases

of MCRA claims for interference with speech, because it is not a right that necessarily depends upon the agreement of the parties. *See Paradis v. United Technologies,* 672 F.Supp. 67, 70 (D.Conn.1987) (holding that claim under Connecticut law for employer discrimination based upon the employee's exercise of privacy and free speech rights not preempted). *See also Barron v. Safeway Stores, Inc.,* 704 F.Supp. 1555, 1564–65 (refusing to hold handicap discrimination claim preempted where it is not "absolutely clear" that interpretation of the agreement will be necessary).

Defendants have thus far not even argued that they did consider Karetnikova's First Amendment activities in denying her tenure, let alone offered an interest in restricting the faculty's protected speech that would require interpretation of the CBA. At this point, therefore, the court cannot conclude that interpretation of the CBA will be necessary and therefore cannot conclude that plaintiff's claim is preempted. Should it become evident, at a later point in these proceedings, however, that the court, in order to weigh adequately the interests of the parties, must in some significant way refer to the CBA, the court may then reconsider in whole or in part its decision on preemption.

## ORDER

For the foregoing reasons, it is ORDERED:

(1) Plaintiff's motion to file its memorandum in opposition late is allowed.

(2) Defendants' motion to dismiss Counts I, II and IV is denied.

(3) Defendants' motion to dismiss Count III is allowed to the extent that it seeks to state a state-law claim independent of the CBA. It is denied to the extent that Count III states a claim under the CBA.